# In the United States Court of Federal Claims

No. 17-1736C
(Filed: May 28, 2021)
(Re-Filed: June 16, 2021)[1]
NOT FOR PUBLICATION

* * * * * * * * * * * * * * * * * * * * *

POND SECURITY SERVICES, GmbH,

        *Plaintiff,*

v.

THE UNITED STATES,

        *Defendant.*

* * * * * * * * * * * * * * * * * * * *

Contracts; Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (2012); motions for partial summary judgment; CDA statute of limitations; estimates in requirement contracts.

## OPINION

On February 26, 2009, the United States Army ("the Army") entered into a requirements contract with Pond Security Service GmbH ("Pond") pursuant to which Pond would provide contract security guards ("CSG") on American army bases in Germany. The contract was eventually performed, but Pond has filed suit pursuant to the Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (2012) ("CDA"), claiming that the Army breached the contract in by ordering far less services than estimated. The complaint contains three counts. In count I, plaintiff claims that the agency negligently prepared a quantity estimate to offerors; in count II, plaintiff asserts that that the government withheld superior knowledge regarding CSG requirements; and in count III, plaintiff claims that the government's actual number of hours ordered constitutes a major change under the contract.

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of protected material. On June 16, 2021, the parties notified the court that they have no proposed redactions for the opinion. We thus reissue this opinion unredacted.

Pending are the parties' motions for summary judgment. Pond moves for partial summary judgment on the issue of entitlement for all three counts; it does not address the issue of damages. Defendant cross-moves for summary judgment on counts I and II. Additionally, the government argues in the alternative that the court should bar Pond from recovering damages under counts I and II insofar as they are traceable to task order No. 2. The government also seeks partial summary judgment on "additional costs" claimed under count III, costs incurred while performing work under task order No. 2, and costs incurred due to the illness of Pond employees. The motions are fully briefed. Oral argument was held on May 26, 2021. Because material questions of fact remain, we deny both parties' motions.

BACKGROUND[2]

Pond was the incumbent contractor on the prior indefinite delivery, requirements contract to provide security guard services on American army bases in Germany since September 2003.

1. The Army's Changing Requirements Prior to this 2009 Contract

During that contract, the Army was in the middle of a "transformation" or a "restationing" in Europe. A transformation includes any change that affects "the command both operationally and organizationally." Def.'s Mot. Ex. 2 at 114 (Association of the United States Army Journal).[3] This process involved "a large increase in manning, and then later a decrease in manning." Id. at 168 (Geier Dep.). Pond's proposal for the present contract recognized that "fluctuations in the requirements [for the 2003 contract] were immense." Id. at 117 (Pond's Proposal).

In 2007, as part of this transformation, USAREUR announced reductions of Army personnel in Germany "of approximately 1,720 Soldiers, 3,300 family members, 480 U.S. civilians and 530 local national civilians." Id. at 106 (USAREUR News Release). These plans changed, however, when the Army announced a temporary delay in the reduction of troop levels in

---

[2] The facts are drawn from plaintiff's complaint and from attachments to both parties' briefs. The vast majority of the recitations of the background section are undisputed, nevertheless, there are disputed issues of fact that the court will attempt to isolate.

[3] The parties presented multiple documents within each exhibit. We have identified the document's name after the exhibit number to provide clarity.

Europe in December of 2007, "essentially undoing previous orders to reduce Army forces in the region." *Id.* at 115.

A series of events took place prior to contract award related to the use of CSG's. On March 14, 2008, the agency received a memorandum from the Army Office of the Provost Marshall General ("OPMG") with the subject line "Department of the Army Guidance on the Use of Contract Security Guards (CSG) in the United States Army, Europe and Seventh Army (USAREUR) Area of Responsibility (AOR)." Pl.'s Mot. Ex. 4 at 134 (March 2008 Memo). The memorandum stated that its purpose was "to provide guidance to USAREUR and IMCOM-Europe on the use of CSG for access control in the USAREUR AOR." *Id.* The document also stated that "CSG costs have steadily risen and funding is insufficient given costs of the Global War on Terrorism, Army Transformation and USAREUR Restationing." *Id.* The primary purpose of the memorandum was:

> . . . . to standardize operations and to control costs for centrally funded CSG in the USAREUR AOR as follows:
> a. DA civilians, military police and CSG will not fill the same IACP requirement.
> . . . .
> c. OPMG will only fund CSG for IACP as justified by installation pedestrian and traffic flow.
> d. USAREUR and IMCOM-E will conduct traffic studies to determine access lane manpower requirements. . . . .
> e. Installation commanders who determine the need for additional CSG personnel for IACP (those personnel not justified by traffic flow) and other installation security missions will submit a request for exception to policy through their chain of command to the Provost Marshal General.

*Id.* at 134-35. Pond did not receive the memorandum until June 9, 2009, more than three months after it was awarded the contract on February 26, 2009.

Then on August 13, 2008, the Security Operations Branch presented an internal agency PowerPoint. *Id.* at 20-21 (Wojtyna Dep.). Mr. Edward Wojtyna, the CO's representative, was responsible for preparing estimates for the 2009 contract. Mr. Wojtyna testified regarding the PowerPoint:

> Q. Okay. And this appears to be showing the difference between the USAREUR manning standards as they currently existed, contrasted with the Department of the Army guidance on the use of CSGs. Do you see that?

A. Yes, sir.

Q. And that right-hand column, the DA guidance, is that essentially referring to the March 2008 Army policy?

A. Without matching, I'm assuming it is, correct. That's what it would have been used.

Q. At this point in time it's reasonable to assume that that's what it was referring to?

A. Correct. Yes.

Q. And does this show that a reduced number of guard positions would be forthcoming?

A. By a strict application of the DA guidance, yes.

Q. . . . The USAREUR manning standards were two guards up to 200 -- is that persons per hour?

A. Correct.

Q. And the new standard would be one guard per access lane per every 300 vehicles per hour or less?

A. Correct.

Q. And that average number of vehicles as referenced here in the DA guidance, would that be determined by the traffic studies?

A. Yes.

*Id.* at 21.

Next, the Army's August 25, 2008 Acquisition Strategy, which was not made available to plaintiff prior to award, stated that "the various dynamics of transformation, installation closures, funding constraints, and unforeseen, unplanned force protection needs . . . make it virtually impossible to predict future requirements with any degree of certainty." Def.'s Mot. Ex. 2 at 16 (Acquisition Strategy). It recited that "a realistic ceiling amount to capture all unknown, unforeseen requirements would put the contract ceiling so high that it would be become unrealistic and misleading." *Id.* at 16. It also stated that, "Although USAREUR transformation could reduce contract requirements during the total performance period, specific reductions have not been considered in this estimated dollar value based on possible changes to the current plan." *Id.* at 15.

The Acquisition Strategy reflects that Army planners believed that USAREUR could have an increase in CSG requirements during the 2009 contract because of "unplanned force protection needs." *Id.* at 16. Thus, because of potential increases or decreases in CSG requirements, the Army chose to use a requirements contract for this solicitation, as it found that it

would be impossible to determine a specific minimum or maximum quantity needed for the 2009 contract.  *Id.* at 16.

At deposition, Mr. Wojtyna was asked whether the March 2008 memorandum contained directives.  In response to the question, "you'd have to implement what was being required of you, correct, from the Pentagon?", he stated, "Life is more complicated than OPMG issues an e-mail or issues a policy memorandum, it's up to the Army commanders to execute the programs, but not execute the -- based on the requirements within their command."  Pl.'s Opp. Ex. 2 at 16 (Wojtyna Dep.).  Mr. Wojtyna was then asked whether "the policy required you to conduct traffic studies . . .?".  In response, he stated, "Correct."  *Id.* at 17 (Wojtyna Dep.).  In August of 2009, after award of the contract, the Army completed the traffic studies contemplated in the 2008 documents.

Plaintiff asserts that the agency knew it would not meet the new manning standard provided in the March 2008 memorandum and delayed implementation of the traffic studies by five months.  To support this argument, Pond presents more of Mr. Wojtyna's testimony:

> Q. Do you know when these traffic studies were planned on being conducted?
> A. I wasn't planning to do them at all, but we ultimately did them, I think, in August of 2008, I think -- or August of 2009 we ultimately did them.
> Q. Okay. When you say you were not planning on doing them at all, what's the basis of that statement?
> A. Because they were -- in my mind they were a waste of time. . . . We knew that they were not going to – we could not meet the traffic flow standards as established in their memo, so -- and I told them at the time and they knew that at the time. So – but they wanted to standardize how -- the contract guard program throughout the Army. So I -- again, I didn't see a point -- it was pointless to do that because I already knew we were not going to meet their standards.

Pl.'s Mot. Ex. 4 at 10 (Wojtyna Dep.)

 Between 2006 and 2009, prior to the contract award, the Army Audit Agency ("AAA") completed a series of audits for the purpose of reviewing the Army's use of CSGs in Germany.  On June 6, 2007, the AAA issued a report identifying a possible reduction of $39.7 million in CSG costs.  This was followed on April 28, 2008, by a report identifying an additional $12.4

million in possible reductions, and on November 14, 2008, with a report identifying another $2.8 million in possible reductions.  Def.'s Mot. Ex. 1 at 138, 140, 147.  Mr. Chad Geier, Pond's contract manager, testified in a deposition regarding Pond's awareness of the AAA audits:

> Q. While performing . . . that 2003 Contract, Pond became aware of U.S. Army audits that were ongoing?
> A. In conjunction with the USAREUR transformation, there were audits being conducted, yes.
> . . .
> Q. . . . Did Pond have an understanding as to whether any cuts were implemented in response to the audits that were conducted during the 2003 Contract?
> A. Yes, there was cuts conducted after audits that were conducted in the 2003 Contract, but what their relevance to the 2009 Contract is, I cannot make that connection.
> Q. Did you -- had you ever seen any audit reports issued by the U.S. Army Audit Agency before this litigation started?
> A. I -- I may have seen abbreviated audit reports. I don't think I ever saw the full audit reports. I did see information come out of these, but I don't know if that was directly from the audit agency or if it was from another government office that just produced information from that. I do not know who produced it.

Def.'s Mot. Ex. 2 at 177-78.

After the AAA audits were completed, USAREUR took action to reduce manning at installations identified by the AAA.  Mr. Wojtyna testified that the AAA identified specific potential reductions between the issuance of the March 2008 memorandum and award of the 2009 contract.  Def.'s Mot. Ex. 2 at 134 (Wojtyna Dep.).   In an agency email reporting on the manning standards in USAREUR, the Army stated that the review program reduced CSG positions by 33% (from 1,288 positions to 891) from 2006 to the date of the report, May 13, 2009.  Def.'s Mot. Ex. 2 at 97.  Mr. Wojtyna explained that, by 2008, USAREUR had sufficiently "adopted . . . the manning standards, to the level" required by the AAA audit reports.  Def.'s Mot. Ex. 2 at 134.  Thus, after the conclusion of these audits, both USAREUR and the AAA believed that, going forward, USAREUR had adopted appropriate manning standards.  *Id.*  Mr. Wojtyna also testified that he incorporated the AAA's reductions into the estimates for this solicitation:

> Q. So was that yes, you did factor in these revised standards into the solicitation estimates?
> A. I factored in the results of the AAA audits that had been conducted of the program, who used -- partially what they used in their assessment in the audit was the 2008 manning standards, but not a strict application of the standards.

Pl's Mot. Ex. 4 at 21 (Wojtyna Dep.).  Mr. Wojtyna gave further testimony regarding the Army's estimates:

> Q. Okay. I mean, and so whether it was from the 2008 memo or whether it was from transformation, in any event, there were reductions that were anticipated presolicitation that were not accounted for in the estimates. Is that a fair statement? . . . . [A.] Correct. True statement. Ultimately there were reductions to both -- because of both, not to both – because of both factors [the March 2008 Memorandum and the transformation].

*Id.* at 33.

2. The Solicitation

On October 10, 2008, the Army issued the solicitation for the 2009 contract at issue here, requesting offers for the provision of CSG services at various garrisons throughout Germany.  The Army elected to pursue a "requirements contract for the supplies or services specified" under Federal Acquisition Regulations ("FAR") 52.216-21, but reserved the right, in the event of "planned or unforeseen operational requirements," to modify "the function, location, and operating hours of security posts and/or patrols to meet both permanent, immediate and temporary (on short-notice) changes in security operational requirements."  Def.'s Mot. Ex. 1 at 14 (Solicitation).

The solicitation instructed that the quantities of requirements provided in the solicitation "are estimates only and are not purchased by this contract." *Id.* at 13.  Further the solicitation states that, if the Army's "requirements do not result in orders in the quantities described as 'estimated' or 'maximum' in the Schedule, that fact shall not constitute the basis for an equitable price adjustment."  *Id.*

The Solicitation contained a pricing template for each Garrison based upon an estimated number of hours that would be required.  Initially, the solicitation estimated that 6,371,678 hours would be needed annually. Between the time when the solicitation was issued on October 10, 2008, and

the time when the contract was awarded to Pond on February 26, 2009, the Army issued six amendments to the solicitation that had the effect of adjusting CSG estimates.  Pl.'s Mot. Ex. 4 at 492.  The final contract estimated that 5,530,083 hours would be required annually.  Def.'s Mot. Ex. 2 at 142 (Wojtyna Dep.).  Mr. Wojtyna testified at deposition that these "estimates were based on where the guards were currently at, which included any changes that were going to be – that had been listed under the tiger team audits and the existing closures, any of the existing information we had on closures."  *Id.* at 138.

The solicitation stated that such estimates were "based on historical information and on the best information available to the Government at the time of solicitation issue."  Pl's Mot. Ex. 1 at 234.  It also stated that each quantity provided by the government "is an estimate of the number of hours that may be ordered for a given location; however, actual quantities ordered may be greater or lesser than the estimated quantities."  *Id.*  Further, the solicitation warned:

> The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

Def.'s Mot. Ex. 1 at 10 (Solicitation).

Section 1.1.2 of the solicitation, entitled Performance Work Statement ("PWS"), allowed the contractor to recover "additional costs" resulting from changes in "guard functions, locations, and operating hours."  *Id.* at 17.  As for any minor changes "in guard force functions, locations, and operating hours," however, the solicitation provided that these changes "will be at no extra costs to the U.S. Government provided such changes do not impose additional costs on the contractor."  *Id.* at 14.  It further provided that "examples of minor changes are, temporary location changes within a small geographic area and temporary shift changes of less than 4 hours."  *Id.*

The solicitation further explained that any "[m]ajor changes in guard force functions, locations, and operating hours will be at no extra cost to the U.S. Government provided such changes do not impose additional costs on the Contractor," and that "[e]xamples of major changes are the elimination within one Site (the area of responsibility of one Site Manager) of the annual

hourly equivalent of two or more 24 hours per day, 7 days per week guard positions (total: 17,520 hours annually)." *Id.* at 4.[4]

### 3. Pond's Proposal

Pond submitted a proposal to the Army on November 24, 2008. It contained a "basis of estimate" that set forth pricing. The basis for estimate contained a "fully burdened labor rate" for each contract line item number ("CLIN") identified in the solicitation.

### 4. Contract Performance

Pond was awarded the Contract on February 26, 2009. The Contract provided for one base year and three one-year options, each of which was exercised by the Army. Performance commenced on May 30, 2009, and extended until May 28, 2014.

To place orders under the 2009 contract, the Army periodically sent task orders to the awardee that set forth what CSG services the Army would require. *See Id.* at 12-13 ("Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the Wiesbaden Contracting Center."). Additionally, the solicitation notes that "delivery orders or task orders are subject to the terms and conditions of this contract." *Id.* at 13.

The Army's task orders were modified bilaterally in 2009 and in 2010, to decrease the previously ordered amounts. The parties completed another bilateral modification of a task order on March 22, 2013, in modification ("Mod.") 04 of Task Order No. 2 to "deobligate the remaining unused hours and funds" covering work performed between May 30, 2012 and May 29, 2013. Def.'s Mot. Ex. 1 at 23 (Mod. 04). Mod. 04 contains the following contractor's release: "[Pond] having received all payments due under contract W912CM-09-D-0015-0002, hereby releases and discharges the Government from all liabilities and claims, including interest and related costs, which it now has or hereafter may have, arising under this task order." *Id.* at 23. At the time Pond received Mod. 04, it had already submitted a

---

[4] Unlike "minor changes," "[t]he Contractor shall normally receive formal notification from the COR 90 days prior to the effective date of major changes except in those cases where the Contractor informs the Government that the reductions can be implemented at an earlier date as a result of the Contractor's ability to avoid costs by the attrition of personnel." Def.'s Mot. Ex. 1 at 4 (Solicitation).

request for equitable adjustment ("REA") and was discussing the REA with the government.  Pl.'s Opp. Ex. 1 at 3 (Geier Decl.).

Pond attached a declaration to its motion from Mr. Geier, which states that while the contract was being performed, from May 30, 2009 to May 28, 2014, the Army decreased its ordered hours "by nearly 30%."  Pl.'s Mot. Ex. 1 at 4 (Geier Decl.).  The point of his comparison, however, is not a decrease from awarded hours in prior task orders, but from the original solicitation estimate.[5]  Instead of the approximately 21 million hours estimated in Amendment No. 5 of the of the Solicitation, the Government only ordered approximately 15 million hours."  Pl.'s Mot. Ex. 1 at 4 (Geier Decl.).  It appears that the government does not dispute this assertion.

Mr. Geier's declaration also includes a statement regarding the effect of the Army's estimates upon plaintiff's costs:

> In order to quantify the various direct costs related to contract performance, Pond calculated a mark-up rate, referred to as the "load factor" in the Complaint. . . . The calculation of the "load factor" ("LF") resulted from two variables, specifically variable x, which is the summation of all direct costs contained in the [basis of estimate] direct cost pools for a contract year and variable y, which is the total number of CSG hours, meaning $LF = x + y$. As this formula indicates, a decrease in the number of CSG hours ordered (variable y) with constant direct costs (variable x), results in a higher load factor (LF).

Pl's Mot. Ex. 1 at 3.  On this point, Mr. Geier also stated, "Pond relied on the hours and positions provided by the Army as the basis for determining the loaded hourly rates it presented in its price proposal."  *Id.*

On February 12, 2012, Pond submitted a REA to the Army in the amount of €6,558,416.15 euros. The basis for this REA was that the Army undertook "post award efforts to save money on the security guard contracts and to use the funds allocated for security guard costs for other purposes." Pl.'s Mot. Ex. 4 at 1064 (REA).  On December 17, 2013, the contracting officer ("CO"), Mr. Roberto J. Gotay, denied the REA.

5.  Plaintiff's CDA Claim

---

[5] Plaintiff's counsel represented during oral argument that the government issued two task orders during the life of this contract.

Pond submitted its certified claim to the CO on May 24, 2016. The claim sought €9,990,930.93 euros plus CDA interest as a result of Army changes to the contract, "result[ing] in 31.98% less of the guard services than indicated in the Contract quantity estimate." Pl.'s Mot. Ex. 4 at 1213 (Certified Claim). The certified claim argued that the reduction in guard services was the result of a negligent estimate made by the Army.

In its certified claim, Pond attached a graph depicting the price differential between the contract price and the re-determined price for the reduced hours ordered during the contract period. Pl.'s Mot. Ex. 4 at 1231.

| Period | Estimated Hours | Hours Provided/In voiced | Amount Invoiced for Hours Provided (w/o Sp. Event Hours) | Re-determined price for hours provided (w/o Sp. Event Hours) | Difference (w/o Special Event Hours) |
|---|---|---|---|---|---|
| 05/09 - 05/10 Base year | 5,533,203 | 4,367,793 | 106,971,405.45 € | 109,777,348.93 € | 2,805,943.48 € |
| 05/10-05/11 1st Option | 5,533,203 | 4,071,297 | 99,773,697.55 € | 102,445,811.26 € | 2,672,113.71 € |
| 05/11-05/12 2nd Option | 5,533,203 | 3,529,178 | 90,235,370.18 € | 92,634,646.99 € | 2,399,276.81 € |
| 05/12-05/13 3rd Option | 5,533,203 | 3,077,539 | 80,802,791.35 € | 82,916,388.28 € | 2,113,596.93 € |
| Total | | | | | 9.990.930,93 € |

Pl.'s Mot. Ex. 4 at 1231.

Pond argued in its claim that the Army's estimates were negligent because it had information prior to award, not shared with Pond, that should have alerted the Army to the likelihood of more reductions. The CO's final decision ("COFD") denied Pond's claim on November 29, 2016, finding that Pond had received "a realistic estimated total quantity for CSG manpower requirements in the solicitation and resulting contract based on the most current information available" at the time and "adequate information to understand the Government's estimates and what would be required to successfully perform the contract." Pl.'s Mot. Ex. 4 at 1330-31 (COFD). The decision further explained that the March 2008 memorandum relied upon by Pond in its claim "contained no directive to reduce or relax standards," but instead "provided guidance to calculate an objective requirement, and the means to deviate from the objective requirement." *Id.* at 1332.

The COFD invited Pond to provide clarification in the event Pond believed the Contracting Officer misunderstood the claim. Pond responded

with a letter on January 13, 2017.  On February 27, 2017, the CO confirmed its November 29, 2016 COFD.  Pl.'s Resp. Ex. 2 at 26 (CO Letter).  The confirmation explained that "[a]ny differences in actual ACP manning quantities ordered were not major changes" under the contract because the "applicability of 'major changes' [is] only in relation to changes in and to the individual task orders issued under the contract, and not to differing order quantities over the life of the contract from estimated quantities."  *Id.*  With respect to the March 2008 memorandum, the confirmation reiterated that it contained no directive to reduce standards and that directives to reduce manning levels were not issued until after the contract was awarded.  The confirmation noted that it was a final decision and explained how Pond could appeal the decision.  On November 6, 2017, Pond filed a complaint, initiating an action in this court challenging that decision.

DISCUSSION

Plaintiff filed a motion for partial summary judgment on all three counts of its complaint, and defendant filed motions for summary judgment on counts I and II of plaintiff's complaint and a partial summary judgment motion on count III of plaintiff's complaint.

A. The Government's Motion for Summary Judgment Based on the Statute of Limitations.

The government asserts that, because Pond filed its certified claim on May 24, 2016, any claim that accrued prior to May 24, 2010, would be barred by the 6-year CDA statute of limitations.  41 U.S.C. § 7103 (a)(4)(A).[6]  The government argues that counts I and II are barred by the statute of limitations and also argues that because count III seeks additional costs under Section 1.1.2 of the solicitation, to the extent that Pond incurred these costs before May 24, 2010, it is barred from recovering such costs.

Pond obtained a copy of the March 2008 memorandum on June 9, 2009.  Defendant argues that counts I and II accrued on that date, because both counts argue that had Pond been informed of the relaxed manning standards at the time of the March 2008 memorandum and Pond would have

_____

[6] The government acknowledges that it did not plead this affirmative defense in its answer, but adds that while "an affirmative defense may be waived if not pled as prescribed," "the waiver is not effective absent unfair surprise or prejudice."  *First Annapolis Bancorp, Inc. v. United States,* 75 Fed. Cl. 280, 288 (2007).

been able to apply a "higher 'load factor' to the wage costs, which would have resulted in higher CLIN prices [of] 9,990,930.93 euros." Compl. ¶ 47. Thus, according to defendant, when Pond learned of the memorandum, it knew of the events that "fix the alleged liability of . . . the Government . . . and permit assertion of the claim," and it had knowledge that "some injury [has] occurred." *Sikorsky Aircraft Corp.*, 773 F.3d 1315, 1320 (Fed. Cir. 2014).

In its opposition, Pond argues that the government failed to assert this affirmative defense in its answer, and thus, the government's defense is untimely. It is unnecessary, however, for the court to decide whether defendant has waived its statute of limitations defense, as we do not find that plaintiff's counts I and II accrued on June 9, 2009, when Pond received the March 2008 memorandum.

Pond argues that its claims did not accrue on June 9, 2009, because the memorandum did not make clear that it would impact the current contract.[7] We agree. The language in the memorandum does not include any clear statement that the volumes under the 2009 contract would be impacted. It would have been impossible for Pond to know whether it was injured at that time. *See* FAR § 33.201 (defining "accrual of a claim" as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred.")[8] The memorandum does not present anything from which the plaintiff could have calculated an injury, and thus, the memorandum could not have fixed the government's alleged liability.

It is unnecessary for the court to find the precise date of when the statute of limitations could have been triggered, as the government only

---

[7] Defendant argues in the alternative that, if Pond had no idea what the implications of the memorandum would be, the memorandum could not have provided Pond with any meaningful information about the Army's requirements, and thus, the government could not have withheld superior knowledge. We deal with that assertion below.

[8] The government argues that Pond's claim accrued when "some injury . . . occurred," not when Pond could determine the amount of its claim. Under 48 C.F.R. 33.201, the date of a claim's accrual is determined by the events fixing the "alleged liability" of the government. However, we disagree that Pond was aware of any injury at the time that it received the memorandum.

offers one date as the triggering event. Because we find that plaintiff's claims did not accrue on June 9, 2009, we deny the government's motion for summary judgment on counts I and II and its motion for partial summary judgment on count III based upon the statute of limitations.

    B.  Count I: The Government Negligently Estimated the Number of CSG Hours in the Solicitation.

A requirements contract obligates "the government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price." *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992) (citing 48 CFR § 16.503(a) (1991)). This type of contract "is useful when the government anticipates recurring needs but cannot predetermine the precise quantities or future demands at the time of the award. The very nature and use of a requirements contract presupposes uncertainty about actual purchases." *Id.* (Citing 48 CFR §§ 16.501(a), 16.503(b) (1991)).

FAR 16.503(a)(1) dictates how the CO must provide estimates in a solicitation for a requirements contract:

> [T]he contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract. This estimate is not a representation to an offeror or contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available.

48 C.F.R. § 16.503(a)(1). Additionally, the Federal Circuit teaches in *Rumsfeld v. Applied Cos., Inc.*, that the government has an "implied obligation" when it utilizes a requirements contract "to act in good faith and use reasonable care in computing its estimated needs." 325 F.3d 1328, 1334-35 (Fed. Cir. 2003).

Therefore, under a negligent estimate theory of breach, a contractor must "show by preponderant evidence that the government's estimates were inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made." *Agility Def. & Gov't Servs., Inc. v. United States,* 847 F.3d 1345, 1350 (Fed. Cir. 2017)

(citing *Medart Inc.,* 967 F.2d at 581).  Without showing "negligence or bad faith, the contractor bears the risk of variance between the estimated and actual contract quantities."  *Medart, Inc.*, 967 F.2d at 581.

Pond argues that it is entitled to summary judgment because the Army's estimates were negligently prepared.  The government asks the court to grant its motion for partial summary judgment on count I because plaintiff has failed "to show by preponderant evidence that the government's estimates were inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made." *Agility Def. & Gov't Servs., Inc.,* 847 F.3d at 1350 (citing *Medart, Inc.*, 967 F.2d at 581).  The parties rely on the same documents and deposition testimony to reach different conclusions.  For the reasons given below, we deny both motions.

First, Pond argues that agency officials knew that the historical data on which the estimates were based did not accurately reflect anticipated reductions under the transformation process.  Plaintiff points to the deposition testimony of Mr. Wojtyna:

> Q. [S]o whether it was from the 2008 memo or whether it was from transformation, in any event, there were reductions that were anticipated presolicitation that were not accounted for in the estimates. Is that a fair statement?
> [A] Correct. True statement. Ultimately there were reductions to both -- because of both, not to both – because of both factors.

Pl's Mot. Ex. 4 at 33.  From this plaintiff concludes that the agency had notice of future reductions which were not reflected in the solicitation.

The government responds that the question presented to Mr. Wojtyna conflated reductions resulting from the transformation with reductions resulting from the March 2008 memorandum.  It is unclear whether Mr. Wojtyna understood the question, as his response rephrased the question, answering that reductions occurred because of the transformation and the March 2008 memorandum.  Thus, the court is unable to determine, based upon his response alone, whether the Army had knowledge about future reductions that it withheld from Pond.

Pond also argues that the agency had other contemporaneous knowledge of anticipated changes to workload requirements.  It cites the traffic study and argues that the agency knew that the studies would result in a reduction in guard positions during the contract period.  Pond points to testimony from Mr. Wojtyna in response to the following question, "did the

traffic studies reveal that there was insufficient funding to continue maintaining the current levels of CSGs in USAREUR?" *Id.* at 17. His answer:

> I believe the traffic studies resulted in what we knew they were going to result in. The traffic studies, using them would have resulted in higher manning than OPMG thought we needed based on the traffic studies. . . . But we knew . . . what the traffic studies would show is that there were more guards at the gates than OPMG thought we were -- we should be using because in their opinion we were supposed to just use the traffic studies for the manning standards.

*Id.*

Pond further asserts that, instead of complying with the mandate to perform traffic studies to adjust guarding levels, defendant delayed the traffic studies for five months.  Plaintiff urges that the agency knew it would not meet the new manning standard and would have to reduce its guard services to meet the guidelines, and thus it waited until after contract award to begin the traffic studies.  Pond argues that this delay injured plaintiff because the estimates were not based on current information available to the Army.  To support this argument, Pond presents the following from Mr. Wojtyna's testimony:

> Q. Do you know when these traffic studies were planned on being conducted?
> A. I wasn't planning to do them at all, but we ultimately did them, I think, in August of 2008, I think -- or August of 2009 we ultimately did them.
> Q. Okay. When you say you were not planning on doing them at all, what's the basis of that statement?
> A. Because they were -- in my mind they were a waste of time. . . . We knew that they were not going to – we could not meet the traffic flow standards as established in their memo, so -- and I told them at the time and they knew that at the time. So – but they wanted to standardize how -- the contract guard program throughout the Army. So I -- again, I didn't see a point -- it was pointless to do that because I already knew we were not going to meet their standards.

*Id.* at 10.

The government disagrees with plaintiff's asserted inferences, arguing the fact that the Army anticipated that using the traffic studies "would have resulted in higher manning than OPMG thought we needed," does not mean that the Army anticipated that it would have to reduce manning standards because of limited funding. *Id.* at 17.  The Army could rely on other sources of funding, defendant asserts, as Mr. Wojtyna testified:

> Q. Well, at this point in time this is August 2008. You had not yet conducted traffic studies, correct?
> A. Correct.
> Q. So you didn't know the results of those traffic studies, what they were going to show; is that correct?
> A. I was confident I knew what they were going to show.
> Q. Okay. They were going to show reduced guard positions?
> A. Correct. . . . by a strict application of those standards. . . . Caveat that by meaning -- they also meant that we would maybe have to resort to alternate funding sources for our requirements. When you say "reductions," it would be a -- reductions in what DA would fund, not necessarily meaning that it would be reductions in guard requirements themselves because there were alternate sources of funding that we could apply.

*Id.* at 22.

While the parties agree on the relevant documents and testimony, there remains disputed inferences from those materials.  Plaintiff has put forward some evidence, supported by Mr. Wojtyna's statements, that the government knew at the time of the solicitation that the traffic studies would result in reduced CSG requirements.  Whether this constitutes negligence, however, requires the court to draw disputed inferences.

Finally, Pond asserts that Mr. Wojtyna admitted that the March 2008 memorandum's effect would be to reduce CSG requirements for this 2009 contract, meaning that the government's estimates were negligently prepared.  Mr. Wojtyna testified regarding the effect of the memorandum on the Army's requirements, "[W]e did have to reduce the number of guards, but not to the level that that memo would take us. That was the disagreement."  Pl.'s Opp. Ex. 2 at 7 (Wojtyna Dep.).  In a follow up question, he was asked, "Q. Okay. Just so I understand this, you agreed that there would be reductions. The disagreement would be over the number of those reductions; is that correct? . . . [A.] Correct."  *Id.* at 7.

17

Mr. Wojtyna further clarified the Army's view of the memorandum's effect, "even though OPMG . . . said they would not fund beyond what . . . was in that memo, . . . there were other funding sources that if we went forward with our requirements, . . . we would either get funding from OPMG or it would be funded through other channels." *Id.* at 12.  Pond contends that Mr. Wojtyna's statement, "we did have to reduce the number of guards, but not to the level that that memo would take us," demonstrates the Army knew that reductions were forthcoming due to the memorandum.[9] *Id.* at 7.

The question of the Army's knowledge at the time of the solicitation regarding future reductions to CSG requirements is material to plaintiff's negligent estimate claim, as the reasonableness of the agency's estimates are determined by the information available to it at the time of solicitation. Plaintiff presents evidence, supported by Mr. Wojtyna's testimony and the March 2008 memorandum, that the memorandum provided the Army with information that should have been used in making its estimates.

The government asserts that the Army provided realistic estimates with information that was reasonably available, as the Army had conflicting considerations causing substantial uncertainties with CSG manning requirements at the time of the solicitation.  First, defendant offers evidence that the Army's cost reduction efforts were the subject of disagreement between OPMG and USAREUR.  After the AAA audits were completed, the government asserts that the USAREUR took action to reduce manning at installations identified by the AAA, and by 2008 the USAREUR sufficiently "adopted . . . the manning standards, to the level" required by the AAA. Def.'s Mot. Ex. 2 at 134 (Wojtyna Dep.).  Thus, after the conclusion of these audits, defendant contends both USAREUR and the AAA believed that USAREUR had adopted appropriate manning standards.  *Id.*

Second, defendant relies on the Army's December 2007 announcement, which stated that that transformation plans would be temporarily delayed, thereby highlighting the unpredictability of the transformation process.  Def.'s Mot. Ex. 2 at 115.  Finally, the government argues that the Army also believed that the USAREUR could have an increase in CSG requirements because of "unplanned force protection needs."  Acquisition Strategy, Def.'s Mot. Ex. 2 at 16.

---

[9] Mr. Wojtyna agreed that the disagreement between OPMG and USAREUR was "over the number of those reductions."  Pl.'s Opp. Ex. 2 at 7 (Wojtyna Dep.).

It is unclear to the court from this evidence alone, however, whether the agency knew that the Army's CSG requirements would inevitably be affected during this contract, and thus, prepared its estimates negligently. Because this is a disputed question of material fact, the issue of the agency's knowledge must be resolved at trial. As discussed above, the extent of the agency's knowledge is a disputed fact. Even though the Army presents countervailing considerations that it had at the time of the solicitation, there is still a genuine dispute of material fact as to whether the Army prepared its estimates with the most current information available to it, or whether it prepared its estimates negligently. Thus, neither movant is entitled to summary judgment as to count I. *See* RCFC 56(a) (summary judgment will be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

C. Count II: The Government Withheld Superior Knowledge Regarding Anticipated CSG Requirements.

The Federal Circuit has held that the government has a duty to disclose its superior knowledge where:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

*Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000) (citing *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)); *see also Miller Elevator Co., Inc.*, 30 Fed. Cl. 662, 675 (1994) (a superior knowledge claim can only be brought with respect to vital facts that "the contractor neither knows nor should have known of . . . by contract specification or otherwise" and where "the Government knew or should have known of the contractor's ignorance of the facts.").

The superior knowledge which plaintiff attributes to the Army is that it knew reductions in guard services were forthcoming but did not disclose this information to plaintiff. Pond claims that it did not know of this fact and relied on the government's estimates, and thus, the Army had a duty to disclose its superior knowledge. It asks for summary judgment on this count.

19

The government seeks summary judgment with respect to count two because plaintiff was aware that reductions were possible during the contract and because the Army had no knowledge of vital facts at the time of the solicitation that it withheld from Pond.  For the reasons stated below, we deny both motions.

Plaintiff asserts that the March 2008 memorandum informed the Army of anticipated reductions for this contract because it contained a mandatory order to reduce costs within USAREUR.  Pond argues that Mr. Wojtyna's testimony shows the Army knew that reductions would be forthcoming as it had an awareness of what the OPMG mandated traffic studies would likely show even before the studies were performed:

> I believe the traffic studies resulted in what we knew they were going to result in. The traffic studies, using them would have resulted in higher manning than OPMG thought we needed based on the traffic studies. . . . But we knew. . . . what the traffic studies would show is that there were more guards at the gates than OPMG thought we were -- we should be using because in their opinion we were supposed to just use the traffic studies for the manning standards.

Pl.'s Mot. Ex. 4 at 17 (Wojtyna Dep.).

The government responds that the March 2008 memorandum was not an order with clear instructions to reduce costs for this contract in Germany. It points out that the memorandum itself merely "provides guidance to USAREUR on the use of CSG for access control in the USAREUR AOR," and does not mandate any response.  Pl.'s Mot. Ex. 4 at 134 (March 2008 Memo.).  Further, defendant argues, the memorandum merely sets forth conditions for funding controlled by OPMG based upon future traffic studies—"OPMG will only fund CSG for IACP as justified by installation pedestrian and traffic flow." *Id.* at 135.  Finally, the government argues that the memorandum gave commanders "who determine the need for additional CSG personnel for IACP" the ability to seek an exception to OPMG's funding policy, allowing the commander to have additional CSG personnel, which may not be justified by traffic flow. *Id.* at 134-35.

Plaintiff replies that Mr. Wojtyna's testimony regarding base closures shows that the Army anticipated reductions which it did not disclose.  The testimony that plaintiff refers to concerns the following statement in the Acquisition Strategy: "Although USAREUR transformation could reduce contract requirements during the total performance period, specific

reductions have not been considered in this estimated dollar value based on possible changes to the current plan." Def.'s Mot. Ex. 2 at 15.  Mr. Wojtyna was asked about this language:

> Q. And so the government recognized that reduced contract requirements were a reasonable possibility . . . or were in fact anticipated for the upcoming contract?
> [A.] "USAREUR transformation could reduce." We knew there were additional reductions coming because of the USAREUR transformation process, but because it was classified -- I guess, hence that statement could reduce contract requirements, because everybody knew more reductions were coming.
> . . .
> Q. And those reductions had been input in place as a result of the prior audits; is that right? . . .
> A. No, it was due to both. Partially due to the closure of garrisons. Primarily caused by the DA-mandated standards for manning.
> Q. Okay. And so bases had closed because of force drawdown and then in addition you had DA mandated standards that were looking to reduce costs. Are those the two factors you're talking about?
> A. Correct. Correct.

Pl.'s Mot. Ex. 4 at 19-20.

Finally, plaintiff presents evidence of an internal agency PowerPoint slide that USAREUR and the Military Police prepared in August 2008 which, it argues, shows plans for compliance with the March 2008 Memorandum's new manning standards.  Pl.'s Mot. Ex. 4 at 148-163.  Plaintiff asserts that the slide depicts the difference between the current USAREUR manning standards and the reduced manning standards under the memorandum, stating that the new standards would require one guard per every 300 vehicles entering the control point rather than the old standard of 2 guards per every 200 persons per hour.  *Id.* at 150.  Plaintiff also presents testimony from Mr. Wojtna regarding the PowerPoint:

> Q. Okay. And this appears to be showing the difference between the USAREUR manning standards as they currently existed, contrasted with the Department of the Army guidance on the use of CSGs. Do you see that?
> A. Yes, sir.

Q. And that right-hand column, the DA guidance, is that essentially referring to the March 2008 Army policy?
A. Without matching, I'm assuming it is, correct. That's what it would have been used.
Q. At this point in time it's reasonable to assume that that's what it was referring to?
A. Correct. Yes.
Q. And does this show that a reduced number of guard positions would be forthcoming?
A. By a strict application of the DA guidance, yes.
Q. . . . The USAREUR manning standards were two guards up to 200 -- is that persons per hour?
A. Correct.
Q. And the new standard would be one guard per access lane per every 300 vehicles per hour or less?
A. Correct.
Q. And that average number of vehicles as referenced here in the DA guidance, would that be determined by the traffic studies?
A. Yes.

Pl.'s Mem. Ex. 4 at 21.  Pond contends that this PowerPoint slide shows that the agency knew the traffic studies would demonstrate that a significant reduction in CSGs would be necessary.

The government has an additional argument, however, that Pond was aware of the possibility of reductions at the time of the solicitation, as Pond was the incumbent on the 2003 contract, and it knew that the Army's CSG requirements fluctuated dramatically during the 2003 contract, thus making defendant's level of knowledge immaterial.  *See Giesler*, 232 F.3d at 877 (rejecting superior knowledge claim where contractor had "equal, if not greater, access to" the information that formed the basis of the claim).

Defendant asserts that Pond's proposal noted that "the fluctuations in the requirements [for the 2003 contract] were immense."  Def.'s Mot. Ex. 1 at 117 (Pond's Proposal).  Additionally, the government points out that Pond's proposal made statements regarding the Army's changing requirements:

These facts, contained in all volumes of this proposal, stem from over 25 years['] experience serving USAREUR. In the recent years of constantly changing USAREUR requirements resulting from GWOT deployments and USAREUR

22

> restructuring and re-stationing, Pond Security has successfully met both planned and emergency changes, additions, reductions, and relocations of our guarding services. USAREUR will continue to undergo reductions and restationing during the contract period. Pond Security has clearly demonstrated its capability to understand and to rapidly respond to USAREUR's changing organization, missions, and geography.

Def.'s Mot. Ex. 1 at 110 (Pond's proposal).

The offered evidence leaves unresolved the Army's level of certainty regarding coming reductions and plaintiff's own expectation of them. It is improper at this juncture for the court to weigh or draw inferences from any piece of evidence without examining witnesses about the relevant documents and their expectations. Thus, the parties' motions must be denied.

D. Count III: The Government's Actual Number of Hours Ordered Constitutes a Major Change Under the Contract.

Pond's count III is an alternative argument that it is entitled to an equitable price adjustment in accordance with the contract PWS, found in Section 1.1.2 of the solicitation:

> Major changes in guard force functions, locations, and operating hours will be at no extra cost to the U.S. Government provided such changes do not impose additional costs on the Contractor. Examples of major changes are the elimination within one Site (the area of responsibility of one Site Manager) of the annual hourly equivalent of two or more 24 hours per day, 7 day per week guard positions (total: 17, 520 hours annually).

Def.'s Mot. Ex. 1 at 7.

Plaintiff argues that Section 1.1.2 permits Pond to recover for cost impacts due to major changes in the quantities ordered.[10] Pond contends that,

---

[10] Plaintiff also asserts that Mr. Wojtyna admitted on behalf of the government that Section 1.1.2, and in particular the language about major changes, was included in the contract because the agency expected reductions in estimated hours and positions during the course of the contract's performance period, including the option years.

because actual hours were more than 30% below the estimated hours provided by the solicitation, the reduction in hours constitutes a major change under the clause.[11]   Pond asserts that it incurred substantial additional costs because of these reductions and asks the court to grant it partial summary judgment as to entitlement.

The government does not contest that Pond is entitled to recover any "additional costs" resulting from changes in "guard force functions, locations, and operating hours" under the contract.  Def.'s Mot. Ex. 1 at 7 (Solicitation).  Defendant argues first that the major changes language refers to reductions from prior task orders, not from the solicitation estimates.[12]  Second, it argues that Pond's motion fails to explain what specific "additional costs" to which it is entitled or how those "additional costs" resulted from the Army's changes in "guard force functions, locations, and operating hours."  *Id.*

A material question of fact exists as to whether the costs Pond has attributed to changes in "guard force functions, locations, and operating hours" are qualifying costs under the contract, and thus, we cannot grant plaintiff's motion for summary judgment as to count III.

Defendant has a cross motion for partial summary judgment as to count III.  It asks the court to grant its motion pertaining to damages Pond seeks in count III for (1) claimed "sick costs" in the amount of €4,067,269.46 euros allegedly incurred between May 30, 2009, and February 29, 2012, and €847,955.98 euros allegedly incurred between March 1, 2012, and December 31, 2013; and (2) claimed damages arising under Task Order No. 2, which included all work between May 30, 2012, and May 29, 2013, because it has been released from liability.  For the reasons given below, we deny defendant's motion.

First, the government asserts that Pond can only recover damages under Section 1.1.2 if there are changes in "guard force functions, locations, and operating hours" that "impose additional costs" on Pond, and not costs

---

[11] Pond attached a declaration to its motion from Mr. Geier, which states that while the contract was being performed, the Army decreased its ordered hours "by nearly 30%.  Instead of the approximately 21 million hours estimated in Amendment No. 5 of the of the Solicitation, the Government only ordered approximately 15 million hours."  Pl.'s Mot. Ex. 1 at 4.

[12] This argument only became clear during oral argument; it was not clearly briefed.

that were Pond's responsibility. Def.'s Mot. Ex. 1 at 17 (Solicitation). Pond, in effect, claims that these sick costs resulted from changes in "guard force functions, locations, and operating hours" effected by the Army, and not from illness. The government responds that Pond presented testimony that, in all instances of illness, employees were required by German law to obtain a note from a doctor and provide it to Pond, and that each employee who took sick leave had provided such a note. Def.'s Mot. Ex. 2 at 180 (Geier Dep.). Thus, defendant argues that Mr. Geier's deposition suggests that the evidence would show that the sick costs were due to employee illness and not due to the Army's changes in "guard force functions, locations, and operating hours."

Plaintiff argues that its claim for sick costs is analogous to a claim for lost productivity in a construction or manufacturing context. *See* Pl.'s Opp'n 33-34 (discussing *Batteast Constr, Co.*, ASBCA No. 35818, 92-1 BCA ¶ 24,697). In *Batteast*, the government changed the requirements for masonry work, and, as a result, the masons were less productive. Plaintiff asserts that the Board awarded the contractor damages because it found that the lost productivity was caused by the change in requirements. *Id.* at 123, 215. Plaintiff avers that, here, Mr. Geier's calculations found that the sick leave at garrisons where CSG positions and hours were reduced or eliminated increased significantly compared to what Pond had expected, and thus, it argues that it can recover these costs. Plaintiff contends that CSG employees took time off to look for other positions because of the uncertainty caused by the Army's reductions.

In response, the government argues that *Batteast* is not analogous because the employees here were not less productive due to a change in requirements. Rather, the employees here took time off work because they were ill, not unproductive, the government argues. Additionally, the government argues that the cost at issue is not one that must be borne by the Army under the contract.[13]

Again, there is a genuine dispute as to whether the CSG employees took of time due to the government's reductions in GSG positions. This issue is material because it will determine whether plaintiff can recover for the costs of the employee's sick leave. Thus, we deny defendant's motion for

---

[13] The government argues that Pond's proposal stated that its CSG contracts would "provide for vacation time, training, and absences due to illness." Def.'s Mot. Ex. 1 at 78 (Pond's Proposal).

partial summary judgment as to plaintiff's claim for damages due to its employee's sick leave.

Next, the government argues that the court should grant it summary judgment as to the claimed damages arising under Task Order No. 2, which includes all work completed between May 30, 2012, and May 29, 2013, because Pond executed a release for these damages.  Defendant contends that any of Pond's claims arising out of Task Order No. 2 are encompassed by the language of the release contained in Mod. 04: "[Pond] having received all payments due under contract W912CM-09-D-0015-0002, hereby releases and discharges the Government from all liabilities and claims, including interest and related costs, which it now has or hereafter may have, arising under this task order."  Def.'s Mot. Ex. 1 at 23.

Pond disputes the government's assertion that plaintiff released the Army from liability associated with Task Order No. 2.   It argues that plaintiff's signature on the bilateral modification merely indicated an administrative acknowledgment of the government's action and not a contract release.  Pond asserts that defendant's argument fails because the parties did not have a meeting of the minds and the modification lacked the required consideration, as Pond received no payment for the modification. To support this argument, plaintiff present Mr. Geier's declaration:

> Pond did not release its claim for costs involved in the litigation when it signed Mod 4. Pond understood that Mod 4, as an administrative Mod for deobligation of funds. At that time, Pond had only recently submitted its REA and was actively discussing the REA with the Government and supplementing the REA as requested by the Government. Mod 4 made no reference to the REA or and changes to the Contract. Pond did not receive any compensation or other consideration for Mod 4.  Notably, the Contracting Officer did not find in his Final Decision and in his Reconsidered Final Decision that Pond had released its claim by executing Mod 4.

Pl.'s Opp. Ex. 1 at 3 (Geier Decl.).

Defendant disagrees with plaintiff's assertion that the statement of release in Modification 04 lacked a meeting of the minds because the plain meaning of the modification is unambiguous, and Pond's subjective understanding of the agreement is irrelevant, it argues. "If the terms of a contract are clear and unambiguous, they must be given their plain

meaning—extrinsic evidence is inadmissible to interpret them." *Barron Bancshares, Inc.,* 366 F.3d at 1375.

On the issue of consideration, the government argues that the parties created a bilateral modification pursuant to the authority set forth in the "changes" clause of FAR 52.212-4. The government argues that consideration does not require payment, but "'[c]onsideration is generally a bargained for exchange consisting of an act, forbearance, or return promise.'" *Carter v. United States*, 102 Fed. Cl. 61, 66 (2011).

Because plaintiff has presented evidence showing a genuine dispute of material fact regarding whether the release language in Modification 04 should be viewed as binding, the issue must be resolved at trial. Thus, we deny defendant's motion for partial summary judgment as to the claimed damages arising under Task Order No. 2.

CONCLUSION

For the reasons given above, we deny plaintiff's motion for partial summary judgment and the government's cross-motions for summary judgment and partial summary judgment. The parties are directed to communicate and propose a schedule for pretrial proceedings in a joint status report on or before June 11, 2021.


s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge